EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANTONIO BUSCAGLIA, ALEJANDRO MEDINA RODRÍGUEZ y GUILLERMO HERNÁNDEZ, acusados y apelantes.

Núm. 7328.—*Sometido:* Abril 19, 1939.  *Resuelto:* Mayo 31, 1939.

*Rafael Buscaglia,* abogado de los apelantes; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR WOLF emitió la opinión del tribunal.

Según los hechos expuestos en la opinión del juez, que se hizo formar parte de la sentencia, la Corte de Distrito de Ponce declaró a los coacusados Antonio Buscaglia, Guillermo Hernández, Alejandro Medina y Candita Collazo culpables de una violación del artículo 11 de là Ley Núm. 67, de 1934 (leyes de ese año, pág. 459), tal cual fué enmendada en cuanto

a su título por la núm. 66 de mayo 9, 1936 (leyes de ose año, pág. 343). Los acusados, en el orden mencionados, fueron sentenciados a penas de cárcel con trabajos forzados de 10 años, 8 años, 8 años y 4 años.

La acusación lee así:

"El Fiscal formula acusación contra Antonio Buscaglia, Alejandro Medina Rodríguez, Guillermo Hernández, Ramón Morales, Candita Collazo y Virgilio Torres, por un delito de infracción al Art. 11 de la Ley Núm. 67 para reglamentar la manufactura, uso, posesión, almacenaje, transporte, venta o donación de explosivos en Puerto Rico; definiendo los delitos y estableciendo penas, declarando una emergencia y para otros fines aprobada en 13 de mayo de 1934, según quedó enmendado su título por la Ley Núm. 66, aprobada en 9 de mayo de 1936, consistente en que allá en o para el día 5 amanecer 6 de julio de 1937, y durante las horas de la noche y en Ponce, P. R., que forma parte del Distrito Judicial de Ponce, P. R., allí y entonces, ilegal y voluntariamente y con el propósito de causar daño o destruir la casa residencia del Rev. Padre Néstor J. Aguilera o de aterrorizar o asustar a las personas que habitaban en la misma y a las que residían en el inmediato vecindario, prepararon una bomba la que contenía pólvora y otros ingredientes de naturaleza explosiva, así como otros objetos capaces de causar grave daño, artefacto éste que los referidos acusados envolvieron en una bandera de los Estados Unidos de América, y allí y entonces hicieron explotar en la citada casa del Rev. Padre Néstor J. Aguilera causándole grandes daños, entre otros, destruyéndole parte de la puerta de entrada, hundiendo parte del piso de cemento, doblando parte de la verja de hierro de su balcón, deteriorando su plafón y rompiendo, además, en pedazos el mobiliario de la sala de dicho edificio, deteriorando su biblioteca, habiendo los referidos acusados hecho explotar dicho artefacto muy cerca de los cuartos dormitorios en donde dormían esa noche el Rev. Padre Néstor J. Aguilera y los que con él residen en dicha propiedad.

"La explosión del referido artefacto, ocurrida en las circunstancias y hora expresadas, produjo en el vecindario de la residencia del Padre Aguilera la consiguiente alarma, susto, sobresalto y terror, así como también produjo alarma, sobresalto y terror entre los habitantes de esta ciudad de Ponce."

Ninguna de las partes en sus respectivos alegatos ha expuesto un resumen de los hechos presentados durante el

juicio, mas el fiscal de esta corte descansa en la relación que de los mismos contiene la opinión del Juez Todd.

La corte concluyó que se habían probado ciertos hechos fuera de toda duda razonable. Haremos un resumen de las que consideramos partes esenciales, o sea, que allá para el 28 de febrero de 1937, se celebró una asamblea del Partido Nacionalista en la cual, entre otras cosas, se aprobó un acuerdo que declaraba al Rev. Padre Néstor J. Aguilera persona non grata a la independencia de Puerto Rico; que el Padre Aguilera, sacerdote católico, tiene y tenía su residencia en los barrios de Clausells y Armstrong, de Ponce, siendo él además Capellán del Regimiento 296 de la Guardia Nacional; que en 4 de julio, 1937, el referido padre salió para San Juan a participar, como miembro de la Guardia Nacional, en la parada que en celebración de dicha festividad se llevaría a cabo el día 5, y que regresó a Ponce en la noche de este último día. Que estando durmiendo, y a eso de la una y media de la madrugada del día 6 de julio, fué despertado por una explosión que sintió y que de momento creyó era un cañonazo del Castillo del Morro, pues la noche anterior había dormido en el Cuartel de Ballajá en San Juan; pero que al ser llamado por otro sacerdote que con él estaba, se dió entonces cuenta de que se trataba de algo distinto, puesto que la explosión fué muy fuerte. Que los efectos que la explosión produjo en la casa, entre otros, fueron los que describe, exponiendo entonces las numerosas cosas que fueron destruídas o averiadas por la explosión. Que al levantarse el Padre Aguilera, olía a pólvora y había humo en la casa y sobrevino una alarma general en el vecindario y un gran tumulto de gente se reunió frente a la casa. Que un objeto que voló cuando la explosión, atravesó las paredes del frente y de atrás, dejando un agujero de seis pulgadas en la casa situada al frente de la del Padre Aguilera. Que la explosión se oyó a más de un kilómetro de distancia. Que el Padre Aguilera conocía al acusado Medina desde el año 1930, pues éste fué monaguillo suyo por cuatro años.

Se probó además, continuó diciendo el juez de distrito, y también fuera de toda duda razonable, que en la casa del acusado Antonio Buscaglia se reunían, con anterioridad al 5 de julio, 1937, unos cuantos nacionalistas entre los que estaban los acusados Antonio Buscaglia, Guillermo Hernández, Alejandro Medina, Ramón Morales y Candita Collazo, en cuyas reuniones se preparaban planes de carácter terrorista, con el fin de aterrorizar al vecindario, causar daños y conseguir dinero de los ricos, siendo uno de los medios de llevar a cabo dichos planes el de utilizar bombas explosivas; y que, específicamente en una de dichas reuniones, se tramó a sugestión del coacusado Antonio Buscaglia, poner y hacer estallar bombas en las residencias del Padre Aguilera y de Pedro J. Rosaly, de Ponce; que la persona que presidía estas reuniones era Antonio Buscaglia; que el que cometiera cualquier indiscreción hacían que lo quemaran en un brazo con una gota de ácido sulfúrico, y hasta él mismo se impuso este castigo; que para llevar a efecto lo tramado los acusados prepararon y fabricaron una bomba explosiva por medio de una lata y de varios materiales que se describen, algunos de los cuales tuvieron que ser cernidos en un cedazo; que dicha bomba fué preparada en la casa de Virgilio Torres y Candita Collazo, y fué puesta en la residencia del Padre Aguilera en la noche del día 3 a amanecer 4 de julio, por el coacusado Guillermo Hernández, mientras otros coacusados velaban en frente de la casa; que dicha bomba se apagó y no estalló; que la misma fué reformada y reforzada por algunos de los acusados y por Santos Rodríguez el día 5 de julio; que la bomba fué envuelta en la bandera americana perteneciente a Antonio Buscaglia y que en la casa residencia del Padre Aguilera se encontraron varios pedazos de la bandera. Entonces la corte procede a enumerar los esfuerzos hechos por la policía para demostrar el origen de los varios componentes de la bomba, incluyendo la tela metálica hallada en la casa de Candita Collazo; que cuando las autoridades registraron la casa de Candita Collazo, donde se había guardado

el cedazo ella dijo que no sabía donde éste estaba, y que el mismo fué finalmente hallado dentro de la letrina que queda en el mismo patio de la casa. Según la corte inferior también se probó, fuera de toda duda razonable, que pedazos del material, o del material idéntico al usado en la preparación y fabricación de la bomba, fueron hallados en la casa del acusado Antonio Buscaglia y Candita Collazo. La corte inferior entonces discute un número de detalles adicionales relacionados con la formación de la bomba, así como la prueba pericial tendiente a demostrar la forma en que se preparó la misma. También discute especialmente la presencia de pólvora. Entonces la corte llega a la conclusión final de que el artefacto preparado por los acusados fué el que estalló en la casa del Padre Aguilera.

Los acusados no presentaron prueba en la Corte de Distrito de Ponce, y en lo que a la prueba en su totalidad se refiere, descansaron en una moción de *nonsuit*. El haber declarado sin lugar dicha moción de *nonsuit* sirve de objeto al señalamiento vigésimo quinto. Este error, como tal, no ha sido discutido en el alegato de los apelantes. El fiscal de esta corte estuvo perfectamente justificado al no prestar atención especial a dicho señalamiento. A este respecto el fiscal dice que de los veinticinco errores tan solo doce han sido discutidos y que únicamente éstos debían ser refutados en su alegato. Lo que los apelantes trataron de hacer después de celebrarse la vista ante este tribunal fué poner una nota a continuación del vigésimo quinto error al efecto de que debía examinarse la página 509 de la transcripción de evidencia. Nada hallamos en dicha página ni en ninguna página posterior que arroje alguna luz sobre la moción de *nonsuit*. Se hizo referencia en las páginas 503 y siguientes. En lo que podría llamarse su relación del caso, los apelantes se refieren a la moción de *nonsuit*. No se ha hecho una verdadera discusión de los hechos allí expuestos, a no ser en efecto para decir que hubo una incongruencia entre la acusación y la

prueba.    Como no se hizo un señalamiento de error sobre este punto específico, el fiscal de esta corte necesariamente no lo discute y no hallamos incongruencia alguna.    Lo que los apelantes dicen es más o menos una repetición de la idea de que la prueba tendió a probar un delito bajo el artículo 516 del Código Penal y no bajo el artículo 11 de la ley del 1934.

En realidad, si no hubo incongruencia alguna y si los hechos tendieron a sostener la acusación, la corte inferior actuó correctamente al declarar sin lugar la moción de *non-suit*.    Sobre este punto el fiscal de esta corte dice al final de su alegato que en cuanto al conjunto de toda la prueba practicada, basta con leer la declaración del testigo Santos Rodríguez, para concluir que la misma fué más que suficiente para sostener la sentencia dictada, ya que su testimonio cubre toda la transacción en detalle, tanto en lo subjetivo como en lo objetivo; que este testigo describe la intervención y participación de todos y cada uno de los coacusados, desde el principio hasta el final, limitándose la otra prueba, más que nada, a corroborar su testimonio en muchísimos particulares.

El primer señalamiento se refiere a la resolución de la corte declarando sin lugar una moción de traslado.    Discutiremos este señalamiento al final de nuestra opinión.

■■ El segundo señalamiento lee como sigue:

"La corte inferior cometió error al negar a los acusados el derecho a juicio por jurado y por separado."

Los apelantes tratan de decir primeramente que su supuesto delito estaba cubierto por el artículo 516 del Código Penal.    El segundo fundamento aparentemente es, según lo entendemos, que el artículo 15 de la Ley Núm. 67 de 1934 trata de fijar un procedimiento especial para juzgar los casos, incluyendo en sus términos un procedimiento que priva a los acusados del derecho a un juicio por jurado.    El tercer fundamento es que la promulgación del Código Penal y del Código de Enjuiciamiento Criminal en 1937 y 1935 respectivamente, derogó la ley anterior de 1934, según fué enmendada en 1936.

Es claro que el señalamiento de error es totalmente deficiente al hacer que su interpretación dependa de las tres proposiciones separadas enunciadas más tarde, y además la lectura de dicho señalamiento da muy poca idea de cuál es la supuesta exoneración de los acusados. La corte inferior decidió las cuestiones envueltas al serle originalmente presentadas por moción, resolviendo que si bien el artículo 516 del Código Penal exigía que el delito se cometiera maliciosamente, el artículo 11 de la ley de 1934 no requería malicia. El artículo 516 del Código Penal y el artículo 11 de la ley de 1934, leen así:

"Artículo 516.—Toda persona que maliciosamente, mediante la explosión de pólvora u otra sustancia explosiva, destruyere, derribare, o dañare total o parcialmente algún edificio, con lo cual peligrare la vida o seguridad de seres humanos incurrirá en 'felony'."

"Artículo 11.—Toda persona que use dinamita u otro explosivo ilegalmente con el propósito de hacer daño corporal, o de aterrorizar o asustar a cualquier persona, o para hacer daño o destruir cualquier propiedad, o para hacer daño a la misma en cualquier forma, podrá ser castigada, convicta que fuere, a pagar una multa de no menos de doscientos cincuenta (250) dólares, ni de más de cinco mil (5,000) dólares; o a sufrir cárcel con trabajos forzados por un término que no sea menos de un año ni que exceda de veinte años."

La corte procede a resolver que los delitos son distintos y aún duda que la palabra "voluntariamente" signifique otra cosa que no sea deliberadamente.

Sin embargo, nos parece que la mejor respuesta a esta clase de argumentos es que la Legislatura tiene derecho a establecer delitos que tengan elementos similares pero que quizá sean distintos como sucede aquí. Según el artículo 11 de la ley de 1934, es posible condenar a los acusados sin que haya evidencia de un delito grave. Los acusados pudieron tal vez ser culpables de un delito mayor y ello no impedía que se les procesara por el delito menor.

Estamos muy contestes con el fiscal en que no está envuelta cuestión alguna sobre derecho a juicio por jurado, especial-

mente porque la Legislatura fácilmente pudo abolir el jurado aun para los delitos graves.

Es un principio general de derecho que la promulgación de un código que cubra las leyes penales fundamentales, no deroga ciertas leyes especiales, como la que está bajo nuestra consideración. En otras palabras, la Legislatura podía pasar, y en 1934 pasó, una ley especial sobre la posesión de materias explosivas, y no fué necesario que la Comisión Codificadora incluyera esta ley especial en el nuevo Código Penal. La Legislatura no ha mostrado tendencia alguna a derogar esa ley y las derogaciones implícitas no son favorecidas por la ley. El segundo señalamiento de error es discutido más ampliamente en el alegato del fiscal con citas adecuadas.

██ Los señalamientos tercero y cuarto serán discutidos conjuntamente. Éstos leen así:

"3. La corte inferior cometió error al permitir que por los mismos hechos se mantuvieran dos procesos contra los acusados; bajo alegaciones de dos intenciones distintas e irreconciliables; forzándose la ventilación del proceso por el delito menor mientras se mantenía el otro en pie con el propósito evidente de mantener encarcelados a los acusados durante toda la tramitación del primero.

"4. La corte inferior cometió error al mantener la constitucionalidad del artículo 11 de la Ley Núm. 67 de 13 de mayo de 1934."

La corte inferior resolvió, y convenimos con ella, que el tener pendientes dos acusaciones distintas es generalmente cuestión que concierne al fiscal. La moción de los acusados fué presentada aparentemente mientras se hallaban pendientes ambas acusaciones y la corte creyó que la radicación de la moción envuelta en este caso era prematura para aquel entonces; es decir, antes del juicio. Tenemos la idea, salvo mejor criterio, que los acusados pudieron ser procesados tanto bajo el artículo 516 del Código Penal, como bajo el artículo 11 de la ley de 1934, según fué enmendado en 1936. Igualmente convenimos con el fiscal en que el título de una ley no necesita que describa todo su contenido, y que es suficiente que se identifique su contenido.

El título de la ley en cuestión, según fué enmendado en 1936, dice así:

"Para reglamentar la manufactura, uso, posesión, almacenaje, transporte, venta o donación de explosivos en Puerto Rico, definiendo los delitos, estableciendo penas, declarando una emergencia y para otros fines."

Resolvemos que el título es lo suficientemente amplio para que cubra la cuestión expuesta en el artículo 11 a que ya nos hemos referido. El uso de la palabra "explosivos" hace que el título sea suficiente.

██ El quinto señalamiento provee como sigue y convenimos con el fiscal en que es enteramente frívolo:

"5. La corte inferior cometió error al sostener que la Ley Núm. 66 de 9 de mayo de 1936 es enmendatoria a la Ley Núm. 67 de 13 de mayo de 1934."

Los señalamientos sexto, séptimo y octavo leen así:

"6. La corte inferior cometió error al declarar sin lugar la moción solicitando especificación de ciertos particulares de la acusación y eliminación de otros por su resolución de 17 de agosto de 1937.

"7. La corte inferior cometió error al declarar sin lugar la excepción perentoria de que la acusación imputaba la comisión de más de un delito.

"8. La corte inferior cometió error al denegar la excepción perentoria de que la acusación no se ajustaba a los requisitos exigidos por los artículos 71, 72 y secciones 6 y 7 del Artículo 82 del Código de Enjuiciamiento Criminal."

Hemos leído los alegatos de ambas partes y no hallamos que se cometiera error alguno, o de haberlo, el mismo no fué perjudicial.

Los señalamientos noveno y décimo leen así:

"9. La corte inferior cometió error al concluir que en 28 de febrero de 1937 en una asamblea del Partido Nacionalista celebrada en Ponce, entre otros acuerdos, se aprobó uno declarando al Rev. Padre Néstor J. Aguilera persona non grata a la independencia de Puerto Rico.

"10. La corte inferior cometió error al permitir al testigo Rev. Padre Néstor J. Aguilera declarar en términos generales sobre el

contenido de un artículo que había declarado éste haber publicado el 20 de febrero de 1937 en el periódico 'El Mundo'.''

Los apelantes mismos admiten que el móvil del delito no es esencial para una convicción. Sostienen, sin embargo, que cuando en un caso de prueba circunstancial, como el presente, el juez hace comentarios sobre el móvil, la supuesta prueba insuficiente es pertinente, mas conforme el fiscal indica en forma que hemos aceptado, hubo prueba tendiente a demostrar el móvil del delito.

En los señalamientos undécimo y duodécimo se alega:

"11. La corte inferior cometió error al permitir al testigo Pedro Guillermo Teissoniere declarar como perito en clasificación de distintas clases de pólvoras, identificación de éstas, sus efectos y residuos así como dinamitas y bombas, no habiéndose cualificado el testigo como perito para declarar sobre estas materias.

"12. La corte inferior cometió error al negar la eliminación de la declaración del testigo Luis Fortuño Janeiro porque lo declarado por dicho testigo, aunque relacionado con uno de los acusados, era completamente inmaterial para los efectos de los hechos que se estaban ventilando en la acusación y tendiente tan solo a prejuiciar la mente del juzgador en contra de los acusados.''

Estamos de acuerdo con el fiscal en que el testigo Teissoniere era lo suficiente perito para que declarara sobre este simple artefacto utilizado por los acusados. Teissoniere era un perito en pirotecnia y nada más, pero conocía necesariamente sobre pólvora y otras materias explosivas y su conocimiento era más que suficiente para que cubriera el uso de las materias utilizadas en la bomba que estalló. En relación con las manifestaciones del testigo Fortuño Janeiro y su referencia al hecho de que la bomba estaba envuelta en la bandera americana, etc., creemos que esas manifestaciones no podían afectar seriamente el ánimo de un juez sereno, como creemos lo fué el Juez Todd.

Los señalamientos décimotercero, décimocuarto, décimoquinto, décimosexto, décimoséptimo, décimoctavo, décimonoveno, vigésimo, vigésimo primero, vigésimo segundo, vigé-

simo tercero, vigésimo cuarto y vigésimo quinto, no fueron discutidos en el alegato de los apelantes y es innecesario que este tribunal los discuta, a menos que se nos convenza que se cometió un error fundamental. No hallamos semejante error fundamental.

██ Una de las cuestiones más serias discutidas a través del alegato de los apelantes es que hubo una acusación bajo el artículo 11 supra, y a la vez otra bajo el artículo 516, del Código Penal; que a virtud de esta última acusación a cada uno de los acusados se le fijó una fianza de $20,000 ó $25,000, según sea el caso; que la fianza exigida en el delito menos grave era de $500, que los acusados fácilmente podían haber prestado; que los funcionarios judiciales hicieron esto con el propósito de mantener a los acusados en la cárcel mientras se veía el juicio por el delito menos grave. Dicen que la acusación por el artículo 516 fué archivada después que hubo una sentencia condenatoria en este caso. Nos sentimos obligados a exonerar a los funcionarios judiciales de cualquier mal proceder porque es aparente que en algún momento ellos pudieron haber esperado reunir suficiente prueba para convencer al jurado de la culpabilidad de los acusados y luego haber perdido tal esperanza y entonces haber resuelto archivar el proceso bajo el artículo 516 del Código Penal.

██ ██ El primer señalamiento lee así:

"La corte inferior cometió error al declarar sin lugar la moción de traslado de 9 de agosto, 1937."

El señalamiento es insuficiente. Un señalamiento de error de esta índole o de índole similar debe contener, podríamos decir, alguna indicación de las razones por las cuales la corte erró al declarar sin lugar la moción de traslado. Por ejemplo, los apelantes pudieron haber dicho que la corte inferior cometió error al declarar sin lugar la moción de traslado presentada el 9 de agosto, 1937, basada en el fundamento de que el prejuicio o la parcialidad del juez le impedía presidir el caso tal cual corresponde a un magistrado. Quizá lo anterior hubiese bas-

tado, mas para ayudar a este tribunal, aún hubiera sido mejor si los apelantes hubiesen dicho que esta hostilidad se demostró al fijar una fianza indebida, al dirigir el proceso, con actos de hostilidad hacia los letrados, y en otras formas.

El fiscal de esta corte demuestra o trata de demostrar que una moción de traslado como tal se limita al prejuicio existente en la comunidad que impida la formación de un jurado imparcial, mas no a un ataque al juez. Segundo, el fiscal demuestra que un ataque al juez debe hacerse por razones distintas a las expresadas en el párrafo anterior, o sea, entre otras cosas, que tiene prejuicio personal contra los acusados.

Los apelantes dicen algo al efecto de que las declaraciones juradas radicadas por ellos, y para las cuales no hubo contradeclaraciones, deben ser aceptadas como ciertas. No estamos convencidos de que un "affidavit" desempeña el mismo papel que una demanda en tal forma que sus hechos deban ser admitidos. La declaración jurada es algo distinto a una alegación. Sea ello como fuere, un juez no está obligado a aceptar como presuntivamente ciertos aquellos hechos que se relacionan con él o con su conducta. Carece de importancia que el juez aparentemente rehusara saludar a algunos de los letrados del caso. Pudo haber sido una emoción pasajera o una distracción, y no hay indicios en los autos de que esta actitud prevaleciera. En cuanto a su dicho de que el delito era peor que un asesinato en primer grado, suponiendo que hiciera tal manifestación, podría asumirse que se trataba meramente de una cuestión de opinión, que fácilmente podía ser sustentada por otros. Las actuaciones llevadas a cabo consecuentemente por los acusados podían costar no una sola vida sino varias vidas o un gran número de ellas.

██ Una de las cuestiones, de no ser la principal, a que se dió énfasis fué la fijación de fianzas de $25,000 a dos de los acusados, que fueron posteriormente reducidas por el infrascrito, actuando a nombre de la corte, a $10,000. Esta-

mos plenamente contestes en que la fijación de una fianza alta pudo ser uno de los elementos a utilizarse para demostrar prejuicio por parte del juez, mas este acto por sí solo no es suficiente. Una de las razones fundamentales por las cuales se fija una fianza alta es garantizar la presencia de los acusados durante el juicio.

██ La cuestión más seria lo es la imputación de que el Juez Todd participó activamente en el procesamiento de los acusados, habiéndose en varias ocasiones encerrado con el fiscal de distrito o con el jefe de la policía, y que la impresión general de la comunidad fué que el Juez Todd era el alma del proceso. En un caso corriente es aconsejable que un juez evite dar la impresión de que él se está tomando un interés indebido en un proceso. Queremos decir, sin embargo, que no obstante lo imperfecto del señalamiento de error, si estuviéramos convencidos de que el juez actuó indebidamente y que como resultado de ello los acusados no tuvieron un juicio imparcial, revocaríamos la sentencia. Las quejas de los apelantes, sin embargo, tanto en su moción original como en sus argumentos ante esta corte, no nos convencen de que el Juez Todd se tomara demasiado interés en el caso. El examen que hemos hecho de los autos no nos convence de que él hiciera algo en la búsqueda de prueba o en la presentación de la misma, o de que en realidad penetrara en los deberes del fiscal. Tampoco nos convencen los autos de que el juez tuviera algo que ver con el proceso incoado contra estos acusados específicos. Empero, dando color a la teoría de los apelantes de que algunas de las actuaciones del juez tendían a demostrar parcialidad y prejuicio, esto, conforme veremos, podría obviarse con otras actuaciones del mismo juez. Por lo menos en una de las declaraciones juradas, los letrados de los apelantes declararon sobre la imparcialidad general del Juez Todd al juzgar los casos. Un juez aún podría demostrar cierto celo para que un caso se prosiga y con ello no podría imputársele prejuicio o un móvil indebido.

Como cuestión leve que tiende a demostrar la actitud del juez, podemos referirnos al siguiente hecho. La explosión del artefacto que destruyó parcialmente la casa del Padre Aguilera, era o se convirtió en un hecho familiar para el pueblo de Ponce, y de ordinario cualquiera hablaba de él como una bomba. Sin embargo, cada vez que un testigo se refería a una "bomba", los acusados se oponían y el juez sostenía la objeción. Tenemos realmente la idea de que "bomba" era la palabra corriente que podía usarse; que si no lo era, el conocimiento del testigo podía salir a relucir en la repregunta, y que si se hubiera declarado la objeción sin lugar ello hubiera constituído un error no perjudicial.

No hallamos en la dirección del juicio signo alguno de pasión o prejuicio. Aun si un juez erróneamente y quizá con hostilidad discute un punto de derecho con los letrados, tal manifestación no demuestra prejuicio.

La mejor respuesta al señalamiento de error, conforme una vez más sugiere el fiscal, es el examen de todos los autos del caso, especialmente de aquella parte que se refiere al juicio. Este caso fué una prueba (*test*) pragmática o práctica de imparcialidad y el juez, a nuestro juicio, la pasó satisfactoriamente.

*La sentencia apelada debe ser confirmada.*