EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS FELIPE PADILLA, acusado y apelante.

Núm. 7622.—*Sometido:* Junio 6, 1939. *Resuelto:* Febrero 15, 1940.

*E. Pérez Casalduc,* abogado del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

Luis Felipe Padilla fué convicto de infringir el artículo 328 del Código Penal y sentenciado a sufrir dos años de presidio. Su contención es que toda infracción del artículo 328 del Código Penal es un delito menos grave, castigable tan sólo con multa máxima de tres mil dólares o con prisión en cárcel que no excederá de tres años. La médula de su argumento es la siguiente:

Según el Artículo 204 del Código Penal, tal cual fué enmendado en 1933 (leyes de ese año, pág. 265) el homicidio involuntario es un delito menos grave y "se castigará con pena de cárcel por un término máximo de tres (3) años o multa máxima de·tres mil (3,000) dólares o ambas penas a la vez, a discreción 'de la corte." El efecto de esta enmienda fué enmendar también el Artículo 328 del Código Penal en lo que al castigo para una infracción del mismo se refería. El delito castigado por aquella parte del Artículo 328 que habla de "la muerte de una persona," de la manera allí descrita es una modalidad del delito de homicidio involuntario tal cual el mismo es definido por el Artículo 203 del Código Penal. *Pueblo* v. *Lebrón,* 23 D.P.R. 658. El resolver que todo el Artículo 328 del Código Penal está aún en vigor, no obstante la enmienda que en 1933 se hizo al Artículo 204 del Código Penal, conduciría al resultado absurdo de que un acusado—convicto de infringir el Artículo 328, consistente en conducir temerariamente un automóvil por un camino público, como resultado del cual otra persona recibió lesiones que le ocasionaron la muerte—podría ser condenado a presidio, mientras que otro acusado—convicto del delito de homicidio involuntario por el hecho de haber dado muerte con el automóvil que guiaba a velocidad excesiva en una calle de mucho tránsito y sin dar aviso alguno a otra persona que se encontraba confiadamente parada en la acera o sitio presumible seguro de dicha calle—podría ser condenado a

cárcel o al pago de una multa. Cuando cabe dar a una ley una interpretación razonable es deber del juzgador así interpretarla y evitar con ello el absurdo, como ocurre con la ley que nos ocupa. 59 C. J. 968, sec. 574. Si puede considerarse prácticamente comprendido el delito previsto en el Artículo 328 en aquella parte del Artículo 203 del mismo que define el homicidio involuntario—cuya pena se fija en el Artículo 204—la enmienda de este último, rebajando su calificación y penalidad, deroga aquella parte del 328 que impone una calificación y penalidad más severas.

El apelante se funda en los siguientes casos: *United States* v. *Yuginovich,* 256 U. S. 450; *United States* v. *One Bay State Roadster,* 2 F. (2d) 616; *United States* v. *Stafoff,* 268 F. 417; *United States* v. *Stafoff,* 260 U. S. 477; *State* v. *McClellan* (La.), 98 So. 748; *Espalin* v. *State* (Tex.), 237 S. W. 274; *United States* v. *One Chevrolet Coupé,* 9 F. (2d) 85; *Newbauer* v. *State* (Ind.), 161 N. E. 826; y *State* v. *Tate* (La.), 171 So. 108.

El fiscal de esta corte hace las siguientes citas: *Pueblo* v. *Canals,* 48 D.P.R. 798; *Pueblo* v. *Morales,* 43 D.P.R. 1016; *Pueblo* v. *Román,* 41 D.P.R. 769; *Pueblo* v. *Jiménez,* 31 D.P.R. 351; *People* v. *Collins,* 233 P. 97, 107; 5 Am. Jur. 914, sec. 762; Id. 925, sec. 788; 8 R. C. L. 148; 2 R. C. L. Sup. 562, sec. 133; *Pueblo* v. *Collado,* 30 D.P.R. 188; *State* v. *Schoeffer,* 117 N. E. 220; y *Pueblo* v. *Buscaglia,* 54 D.P.R. 939.

 Los artículos 192, 193 y 369 del Código Penal de California—tanto al tiempo de su aprobación original en febrero 14, 1872, como al tiempo de ser adoptados en 1902 por nuestra Asamblea Legislativa Insular, como los artículos 203, 204 y 328 de nuestro Código Penal—traducidos al castellano, leían así:

"Artículo 192.—Homicidio es dar muerte ilegal a un ser humano sin que medie malicia. Es de dos clases:

"1. Voluntario: cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera.

"2. Involuntario: cuando ocurre al realizarse un acto ilegal, que no constituyere delito grave (*felony*); o al realizarse un acto legal

que pudiere ocasionar muerte en forma ilegal; o sin la debida prudencia o circunspección.''

''Artículo 193.—El homicidio se castigará con la pena de presidio por un término máximo de diez años.''

''Artículo 369.—Todo conductor, maquinista, guardafreno, guardagujas, u otra persona encargada del todo o en parte de cualquier vagón, locomotora o tren de ferrocarril que voluntariamente o por descuido lo dejare o hiciere chocar con otro vagón, locomotora, tren u otro objeto o cosa, ocasionando de este modo la muerte de una persona, incurrirá en pena de presidio en la prisión del estado por un término de uno a diez años.''

En 1908 se agregó el ''automóvil y buque de vapor'' al ''vagón, locomotora o tren de ferrocarril,'' especificados en el artículo 328 tal cual el mismo fué adoptado por nuestra Asamblea Legislativa en 1902. También se agregaron las palabras cualquier despachador de trenes (*train dispatcher*), telegrafista, jefe de estación, o cualquiera otra persona ''encargada en todo o en parte del deber de despachar o dirigir los movimientos de dicho vagón, locomotora, tren de ferrocarril, automóvil o embarcación,'' a la lista de personas previamente enumeradas. Se retuvo la pena máxima de diez años de presidio. El mínimo en lo que a la pena de presidio se refería se rebajó de un año a seis meses. El artículo según quedó enmendado también fijaba una pena alternativa máxima de dos años de cárcel. Véase la Compilación de los Estatutos Revisados y Códigos de Puerto Rico, de 1911, sección 5776.

En 1916 (véase el Código Penal, edición de 1937) se redujo la pena máxima de presidio de diez a cinco años. La pena mínima de presidio y en su alternativa la pena de cárcel—cuando como consecuencia del choque moría una persona—fueron suprimidas, agregándose las siguientes disposiciones:

''Si como consecuencia del choque resultase daño para alguna persona, dicho conductor, maquinista, guardafreno, guardaguja u otra persona, incurrirá en pena de cárcel por un término máximo

de dos años, o multa máxima de mil dólares, o en ambas penas a discreción de la corte.''

El artículo 204 permaneció inalterado hasta 1933. Fué enmendado entonces (véase Código Penal, edición de 1937) y hoy en día lee así:

''El homicidio voluntario se castigará con pena de presidio por un término máximo de diez (10) años. El homicidio involuntario se castigará con pena de cárcel por un término máximo de tres (3) años o multa máxima de tres mil (3,000) dólares, o ambas penas a la vez, a discreción de la corte. Será considerado como un delito menos grave a todos los efectos de la ley y las cortes de distrito de Puerto Rico tendrán jurisdicción exclusiva original en los casos de homicidio involuntario y el acusado tendrá el derecho de solicitar ser juzgado por tribunal de derecho o por jurado.''

En el caso de *United States* v. *Yuginovich*, supra, la Corte Suprema de la Nación dijo (bastardillas nuestras):

''Es cosa resuelta desde luego que las derogaciones implícitas no son favorecidas. Es cosa igualmente resuelta que un estatuto posterior deroga los anteriores *cuando éste es claramente irreconciliable con los más antiguos. United States* v. *Tynen,* 11 Wall. 88. Al interpretar estatutos penales es regla establecida que los preceptos posteriores *derogan los anteriores, cuando prácticamente cubren los mismos actos y fijan una penalidad menor.* La frase final del Artículo 35, considerada por sí sola, indica fuertemente la intención de preservar las leyes más antiguas. Pero este artículo debe ser interpretado *a la luz de la disposición constitucional contenida en la Enmienda Dieciocho y en armonía con los preceptos de la Ley Volstead, aprobada para poner en vigor dicha enmienda.*

''Teniendo en mente los anteriores principios y considerando ahora el primer cargo (*count*) de la acusación que imputa la tentativa de defraudar y el haber defraudado al Gobierno del impuesto de rentas internas, no creemos que el lenguaje general utilizado al final del Artículo 35 evidencia la intención del Congreso *de fijar para tal delito el castigo prescrito en el Artículo 3257, con la consiguiente confiscación, multa y prisión, y al mismo tiempo autorizar el proceso y la penalidad del Artículo 35, que fija penas más leves y especiales por dejar de pagar tales impuestos, y que impone una contribución por el doble de la cantidad prescrita por la ley y una pena adicional de $500 a los detallistas y de $1,000 a los fabricantes.* Además, las

palabras finales del primer párrafo del artículo 35, en lo que a todos los delitos imputados se refiere, deben ser interpretadas a la luz de los principios de hermenéutica legal *y en armonía con las disposiciones de la Ley Volstead misma, que hace ilegal el poseer bebidas embriagantes, o propiedad dedicada a la fabricación de tales bebidas, y prescribe su destrucción.* Convenimos con la corte inferior en que si bien el Congreso manifestó la intención de imponer contribuciones tanto a las bebidas ilegalmente producidas como a las legalmente fabricadas, cosa que estaba dentro de su facultad constitucional, *no fué su intención conservar las antiguas penalidades impuestas por el Artículo 3257 en adición al precepto específico que impone una penalidad en la Ley Volstead.*

"Tenemos *menos dificultad* con las otras secciones de la legislación de rentas internas anteriores, bajo las cuales se han formulado los cargos ya expuestos. Creemos que no fué la intención dejar subsistente el requisito de exhibir al público las palabras '*Destilería Registrada*' en todo establecimiento dedicado a la producción de bebidas embriagantes, *que no pudiera explotarse legalmente;* ni exigir una fianza para el control de tal fabricación; *ni castigar la fabricación de baticiones* (mash) *en una destilería que no podía estar autorizada por la ley.*"

No es necesario que demos énfasis—citando extractos similares de las opiniones emitidas en los otros casos federales, supra—a la diferencia existente entre los hechos de esos casos y los del presente.

En el caso de *Espalin* v. *State,* 237 S. W. 274, la Corte de Apelaciones Criminales del estado de Tejas, resolvió, conforme se dice en el sumario :

"Cuando la Asamblea Legislativa designa ciertos actos, punibles bajo un estatuto ya existente y por determinación específica hace que tales actos estén sujetos a una penalidad distinta a la aplicable hasta entonces, y varía esencialmente los elementos constitutivos del nuevo delito, tales actos específicos quedan fuera de la clasificación anterior y deben en lo sucesivo ser llevados a la clase creada por la nueva ley."

En el caso de *State* v. *McClellan,* 98 So. 748, 749, se dijo que : "Cuando dos estatutos penales son contradictorios en cuanto a la pena a fijarse, ambos no pueden subsistir con-

juntamente. *State* v. *Hickman*, 127 La. 442, 53 So. 680.''
Expresiones similares pueden ser halladas en otros casos,
uno o dos de los cuales son citados por el apelante. Tan
sólo hemos examinado unos pocos de los casos no citados.
Como punto de partida para una investigación ulterior sobre
esta cuestión, véase 59 C. J. 938, sec. 551.

Es ley familiar que un solo acto puede constituir una
infracción de distintos estatutos. *Gavieres* v. *United States*,
220 U. S. 338; *Morey* v. *Commonwealth*, 108 Mass. 433; 8
R. C. L. 149, sec. 135; *Pivak* v. *State*, 202 Ind. 417, 175 N. E.
278, 74 A. L. R. 406.

Es igualmente elemental que en semejantes casos El
Pueblo puede optar por procesar bajo uno u otro estatuto.
*Pueblo* v. *Jiménez*, 31 D.P.R. 351; *In re Converse*, 137 U. S.
624; *People* v. *Dillon*, 199 Cal. 1, 248 P. 230; *People* v.
*Moulton*, 116 Cal. App. 552, 2 P. (2d) 1009; *People* v. *Crane*,
356 Ill. 276, 190 N. E. 355; *People* v. *Menagas*, 367 Ill. 330,
11 N. E. (2d) 403; *Bonahoon* v. *State*, 178 N. E. 570, 79
A. L. R. 453; 1 Bishop's New Criminal Law, 8th ed., sec.
791; 2 Bishop's New Criminal Procedure 480, sec. 612,
subdiv. 4.

El artículo 44 de nuestro Código Penal dispone:

''Un acto u omisión penable de distintos modos por distintas
disposiciones de este Código, podrá castigarse con arreglo a cual-
quiera de dichas disposiciones, pero en ningún caso bajo más de una;
la absolución o convicción y sentencia bajo alguna de ellas, impedirá
todo procedimiento judicial por el mismo acto u omisión, bajo cual-
quiera de las demás.''

El Título VIII de la Parte I del Código Penal de Cali-
fornia trata de los delitos contra la persona. El Capítulo I
de ese título habla de ''Homicidio'' (*Homicide*). Define:
asesinato; malicia, expresa e implícita; grados de asesinato;
homicidio (*manslaugther*), voluntario e involuntario; homi-
cidio exclusable; homicidio justificable, cometido por fun-
cionarios públicos y homicidio justificable cometido por otras
personas. Especifica el castigo para asesinato y el castigo

para homicidio (*manslaughter*) y contiene varias otras disposiciones. Los artículos 192 y 193 forman parte de este capítulo.

El artículo 369 del Código de California forma parte del Título X que trata de los delitos contra la salud y seguridad públicas. Este título en la época en que se aprobó originalmente incluía: muertes producidas por explosiones; muertes causadas por choques de trenes; estorbos públicos; depósito de animales muertos en las calles, ríos, etc.; almacenaje ilegal de pólvora, etc.; violación de las leyes de cuarentena por los capitanes de embarcaciones; infracción de las leyes sanitarias; negligencia en el cumplimiento de las leyes sanitarias; prácticos sin licencia; rotulado de drogas por farmacéuticos; pesas y medidas falsas; adulteración de alimentos y bebidas; venta de drogas, bedidas o alimentos adulterados o dañados; incendios; obstruir cualquier tentativa de extinguir un incendio; explotación de puentes o barcas de portazgo sin autoridad; incumplimiento . de la franquicia concedida para explotar una barca; correr o conducir a velocidad sobre puentes de portazgo; cruzar puentes, etc. sin pagar el portazgo; dejar de tocar la campana de una locomotora en los cruces de las carreteras; embriaguez de los ingenieros, conductores o maquinistas de las locomotoras o automóviles; estacionamiento de automóviles de pasajeros frente a camiones de carga; violación de los deberes impuestos a los empleados de compañías ferroviarias; exposición de personas atacadas de enfermedades contagiosas en sitios públicos; fraudes cometidos para afectar los precios del mercado; regateo en las vías públicas; venta de bebidas a ebrios habituales o a los indios; venta de armas de fuego y municiones a los indios; y muertes producidas por animales bravíos.

El fin obvio de la Asamblea Legislátiva de California al aprobar el artículo 369 fué proteger al público, especialmente a los transeúntes y más particularmente a las personas que viajaban en trenes, de los desastrosos efectos, aunque indi-

rectos, de la negligencia criminal de los encargados de arte-factos tan peligrosos como ferrocarriles, automóviles, loco-motoras y trenes. Muerte como resultado directo de tal negligencia—en ausencia de un choque como los descritos—significaría de ordinario la muerte de un solo individuo. Por otra parte, una colisión entre una locomotora y un carromato o una diligencia en un cruce ferroviario, podría ocasionar la muerte a media docena o más de los ocupantes del vehículo. En un choque ocurrido entre un tren de pasajeros y uno de carga, el número de muertos podría ser cincuenta o más. En una colisión entre trenes de pasajeros el número de personas que perderían la vida podría aún ser mayor. Se-mejantes consideraciones, sin más, hubieran justificado la pena mínima de un año en la penitenciaría del estado, fijada por la Asamblea Legislativa de California.

Hallamos poca evidencia intrínseca de la existencia de una intención en 1872 de prescribir meramente una pena distinta para cierta clase de homicidio involuntario que ya estaba cubierta por la definición dada en el artículo 192. Si tal hubiera sido la intención de la Asamblea Legislativa de California, la forma más simple y más fácil de lograr ese resultado habría sido modificar ligeramente la fraseología de la sección 193. El artículo 369 era igualmente innecesario para remover cualquier duda respecto a si la muerte de un ser humano en la forma indicada por ese artículo equi-valía al homicidio definido por la sección 192. Semejante duda pudo haber sido más fácilmente disipada variando ligeramente el artículo 192. Si la intención del poder legis-lativo fué definir y castigar una clase de homicidio involun-tario, que no estaba ya incluída en el artículo 192, la forma lógica de efectuar esto hubiera sido introducir los cambios necesarios en los artículos 192 y 193. Ninguna de estas tres hipótesis parece suministrar una explicación satisfactoria para la existencia del artículo 369. Este artículo no dice que cualquiera de las personas que realice alguna de las cosas por las cuales puede castigársele en la forma allí pro-

vista es culpable de homicidio o se considerará culpable de homicidio, tal cual ese delito es definido por el artículo 192, ni cosa similar. La omisión es significativa.

Si la Asamblea Legislativa de California no tuvo la intención meramente de fijar un castigo distinto para el delito de homicidio, ni de definir y castigar una nueva clase de homicidio, la conclusión alternativa es—o sería, de hacerse necesario determinar esta cuestión—que su intención fué definir y castigar, y que definió y prescribió, la pena para un delito separado y distinto. Sin embargo, dado el criterio que adoptamos del caso—y especialmente con vista del artículo 654 del código de California, prototipo de nuestro artículo 44, supra—no es menester que discutamos ampliamente este aspecto de la cuestión.

Para los fines de esta opinión podríamos eliminar la cuestión de si la Asamblea Legislativa de California con el artículo 369 del código de California creó un delito distinto y separado. Subsiste el hecho de que en el inciso 2 del artículo 192 la Asamblea Legislativa definía el delito de homicidio involuntario en lenguaje amplio y general. En el artículo 193 fijaba una pena para el homicidio genérico. La mayoría de los actos que pueden ser perseguidos fructuosamente como constitutivos de homicidio involuntario bajo el inciso 2 del artículo 192 y la inmensa mayoría de aquéllos que pueden perseguirse y castigarse como homicidio bajo los artículos 192 y 193, no podrían ser perseguidos ni castigados como infracciones al artículo 369. Por otra parte—asumiendo para los fines de la argumentación que la Asamblea Legislativa en el artículo 369 tenía en mente tan sólo una clase de homicidio involuntario—su mente estuvo fija en esa clase específica. Había escogido y daba cuidadosa consideración a una clase específica de infractores cuya negligencia criminal en el manejo de determinados artefactos podría producir resultados específicos que a su vez ocasionarían la muerte de un ser humano. El delito definido en el artículo 369—al menos al ser procesado un infractor bajo

el mismo—debía castigarse como una violación de ese artículo mediante la imposición de una pena más severa que la provista por la sección 193 para el delito de homicidio, *qua* homicidio. No existía antagonismo básico entre el artículo 369 y los artículos 192 y 193 del código de California. Todos han subsistido juntos por espacio de 68 años sin que se haya puesto en tela de juicio o levantado la existencia de un conflicto o inconsistencia entre los mismos.

Nuestra Asamblea Legislativa insular, al adoptar el artículo 369 del Código de California como artículo 328 de nuestro propio código y al enmendar ese artículo en 1908 y 1916, prestaba atención especial a las mismas cuestiones específicas que habían ocupado la atención especial de la Asamblea Legislativa de California en 1872. Al enmendar el poder legislativo insular el artículo 204 de nuestro Código Penal en 1933, él trataba en términos generales y en forma general con un asunto general, tal cual lo habían hecho en 1902 al fijar por primera vez un castigo para el delito de homicidio como tal. Ni en 1902 ni en 1933 estuvo su mente centralizada en las cuestiones especificadas en el artículo 328 a que prestó atención especial en 1902, en 1908 y en 1916. No hallamos que exista conflicto alguno entre el artículo 328, tal cual fué enmendado en 1916, y el artículo 204, según fué modificado en 1933. En su consecuencia, no hubo derogación implícita.

La lectura de la opinión emitida en un caso de Idaho— *In re Mallon,* 102 Pac. 374—en que el apelante también descansa, bastará para distinguir ese caso.

*La sentencia apelada debe ser confirmada.*